UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                              CASE NO. 10-12931

HARI AUM, LLC                                                       SECTION "B"
    dba Deluxe Motel

    DEBTOR                                                         CHAPTER 11
**************************************************************************
FIRST GUARANTY BANK

    PLAINTIFF

VERSUS                                                              ADV.P. NO. 10-1094

HARI AUM, LLC

    DEFENDANT


## MEMORANDUM OPINION

    This matter was commenced by the complaint of First Guaranty Bank ("FGB") against the debtor, Hari Aum, LLC, doing business as Deluxe Motel (the "debtor" or "Hari Aum") to determine the validity, amount and extent of FGB's lien against the Deluxe Motel located in Slidell, Louisiana. A counterclaim was filed by the debtor, and the adversary was set for trial on May 9, 2011. The parties filed cross motions for summary judgment. At the hearing on the cross motions on April 4, 2011 the court determined that there were no issues of fact requiring a trial and instead required the parties to submit additional briefs on the legal issues involved in the case. Having read the briefs and considered the arguments of counsel, and for the reasons set forth below in this memorandum opinion, the court finds that the Multiple Indebtedness Mortgage recorded by FGB is valid, and that the Deluxe Motel property secures both the loan FGB made to the debtor and the loan FGB made to Mississippi Hospitality Services, LLC.

1

**I.     Standard for Summary Judgment.**

Summary judgment should be granted where, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] The party seeking summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[2] A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine when, "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."[3] All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.[4] Here, at the hearing on the cross-motions for summary judgment, the parties agreed that there were no factual issues requiring a trial and stipulated that all exhibits attached to their respective motions are in evidence, so the court will be guided by those documents.

**II.    Background Facts**

The relationship between the Suresh "Sam" A. Bhula ("Bhula") and FGB appears to have

---

[1] Federal Rule of Civil Procedure 56(c) made applicable herein by Federal Rule of Bankruptcy Procedure 7056.

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d.265 (1986); *Willis v. Roche Biomedical Lab, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995).

[3] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Harris ex rel. Harris v. Pontotoc County School Dist.,* 635 F.3d 685, 690 (5th Cir. 2011).

begun in 2005, when the debtor, a limited liability company, which was wholly owned by Bhula, borrowed $1.8 million to finance the purchase of the Deluxe Motel in Slidell, Louisiana. To evidence and secure this loan, the debtor, through its 100% shareholder, sole officer and managing member, Bhula, signed both a promissory note and a Multiple Indebtedness Mortgage ("MIM") dated January 27, 2005.[5] On that same date, the debtor also signed a commercial security agreement giving FGB a security interest in all equipment, furniture, fixtures, and an assignment of rents and leases in the Deluxe Motel property.[6] The MIM was properly recorded in St. Tammany Parish, Louisiana on February 1, 2005.[7]

The relationship between Bhula and FGB expanded in 2006, when Bhula obtained a commitment letter from FGB, dated May 31, 2006, by which FGB agreed to finance the purchase of a hotel in Hattiesburg, Mississippi through a new entity to be formed.[8] Thereafter, Bhula formed a second limited liability company, Mississippi Hospitality Services, LLC ("MHS") in which Bhula was the 100% shareholder, sole officer and managing member.[9] The loan which FGB agreed to make to MHS was for $4.9 million and was secured by a deed of trust that was properly recorded in Forrest County, Mississippi on June 19, 2006.[10] MHS also entered into a commercial security agreement with FGB dated June 16, 2006, giving FGB a security

---

[5] The MIM is Exhibit D to P-34; The promissory note was not offered as an exhibit, but is referenced in the MIM.

[6] Exhibit F to P-34.

[7] Exhibit D to P-34.

[8] Exhibit J to P-34.

[9] MHS filed a Chapter 7 petition in this court on May 25, 2011; Case No. 11-11697.

[10] Exhibit G to P-34.

interest in all inventory, equipment, general intangibles, consumer goods and fixtures, and an assignment of rents and leases for the Hattiesburg property.[11] The commitment letter specifically states that the Deluxe Motel in Slidell, Louisiana and the 160 unit motel in Hattiesburg were to serve as collateral for the loan to the new limited liability company.[12] Nothing in the other documents executed by Bhula in 2006 in connection with the MHS loan that were entered into evidence shows that any specific steps were taken to encumber the Deluxe Motel property as security for the MHS loan at that time. The MIM, however, does clearly state that it was a mortgage securing future indebtedness.[13]

On April 21, 2009, FGB refinanced both the debtor's $1.8 million loan and MHS's $4.9 million loan. New promissory notes were signed by Bhula on behalf of each of the limited liability companies as well as a commercial guaranty personally obligating Bhula on the Hari Aum loan.[14] On that same date, Bhula also executed two other documents: A Limited Liability Company Resolution to Grant Collateral ("Resolution"),[15] and an Acknowledgment of Existing

---

[11] Exhibit H to P-34.

[12] Exhibit J to P-34.

[13]
> MORTGAGE SECURING FUTURE INDEBTEDNESS. This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law.

[14] Exhibits B, C, and I to P-34.

[15] Exhibit K to P-34. Bhula is the only person appearing on behalf of both the debtor and MHS in all the instruments in favor of FGB.

Multiple Indebtedness Mortgage ("Acknowledgment").[16]

Thereafter, both MHS and Hari Aum defaulted on making their respective loan payments, and on August 12, 2010, Hari Aum filed a Chapter 11 petition for reorganization. Through this adversary proceeding, the parties seek the court's determination of whether the debtor's property, i.e., the Deluxe Motel, serves as security for only the loan between Hari Aum and FGB, or whether it also serves as collateral for the loan between MHS and FGB.

### III. Legal Analysis

The parties ask the court to consider three separate but related issues in this matter: 1) Does the MIM allow FGB to secure future loans without further recording any additional paperwork associated with those loans; 2) Was Bhula authorized to pledge Hari Aum's property to secure the debt of MHS; and 3) If the first two questions are answered in the affirmative, do the documents here effectively accomplish the granting of a security right against Hari Aum's property to secure the MHS loan? The court answers all three of these questions affirmatively for the following reasons.

### A. The Multiple Indebtedness Mortgage

The Louisiana Civil Code was amended in 1991 to update Article 3298, which took effect on January 1, 1992, and now provides that a mortgage may secure future obligations.[17] In

---

[16] Exhibit E to P-34.

[17] Article 3298 provides:
A. A mortgage may secure obligations that may arise in the future.
B. As to all obligations, present and future, secured by the mortgage, notwithstanding the nature of such obligations or the date they arise, the mortgage has effect between the parties from the time the mortgage is established and as to third persons from the time the contract of mortgage is filed for registry.

Louisiana a conventional mortgage may be established only by written contract. No special words are necessary to establish a conventional mortgage.[18]

A contract of mortgage must state precisely the nature and situation of each of the immovables or other property over which it is granted; state the amount of the obligation, or the maximum amount of the obligations that may be outstanding at any time and from time to time that the mortgage secures; and be signed by the mortgagor.[19]

Although Article 3298 took effect in 1992, no Louisiana court has yet issued a published opinion interpreting its provisions. Thus, guidance for this court is furnished by the language of the Article itself and its comments and legislative history. Additionally, the court consulted the excellent law review article, David S. Willenzik, *Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules and a Modern Alternative*, 55 La. L. Rev. 1 (1994), which provided the following guidance:

> If a multiple indebtedness mortgage is properly executed and filed, and if the mortgage contains broadly drafted future advance/cross-collateralization

---

C. A promissory note or other evidence of indebtedness secured by a mortgage need not be paraphed for identification with the mortgage and need not recite that it is secured by the mortgage.
D. The mortgage may be terminated by the mortgagor or his successor upon reasonable notice to the mortgagee when an obligation does not exist and neither the mortgagor nor the mortgagee is bound to the other or to a third person to permit an obligation secured by the mortgage to be incurred. Parties may contract with reference to what constitutes reasonable notice.
E. The mortgage continues until it is terminated by the mortgagor or his successor in the manner provided in Paragraph D of this Article or until the mortgage is extinguished in some other lawful manner. The effect of recordation of the mortgage ceases in accordance with the provisions of Articles 3357 and 3358. L.S.A. C.C. Art. 3298.

[18] L.S.A. C.C. Art. 3287.

[19] L.S.A. C.C. Art. 3288

language, then any and all present and future extensions of credit and other obligations the borrower may obtain from or incur in favor of the mortgagee, or its successors and assigns, while the mortgage remains effective, will be secured by the mortgage up to the maximum dollar limitation stipulated in the mortgage agreement, with retroactive priority rights over intervening creditors dating back to the time the mortgage originally was filed in the public records.[20]

The requirements for a multiple indebtedness mortgage are as follows: 1) It must be granted in favor of a specifically named and designated mortgagee; 2) It should contain no reference to the pledge of a collateral mortgage note; 3) It should define the secured indebtedness to include present and future indebtedness; 4) It should contain a maximum amount of secured indebtedness; 5) It should reference Louisiana Civil Code Article 3298; 6) It should contain language spelling out the procedures under which it may be cancelled; and 7) It should not have a note paraphed for identification with the mortgage.[21]

The court finds that the MIM recorded in St. Tammany Parish meets all of the requirements for a valid multiple indebtedness mortgage set forth by the Louisiana Civil Code. Insofar as it relates to any transactions between Hari Aum and FGB, the MIM secures any loans between FGB and Hari Aum from the date of its recordation, February 1, 2005 up to $50 million. Under the Louisiana Civil Code, it is not necessary for a party who has a properly recorded multiple indebtedness mortgage, such as the bank has here, to record promissory notes evidencing additional loans made under the multiple indebtedness mortgage in order to have those subsequent loans take priority over intervening creditors so long as the total amount of the

---

[20] David S. Willenzik, *Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules and a Modern Alternative*, 55 La. L. Rev. 1, 50-51 (1994).

[21] *Id* at 52-55.

loans does not exceed the maximum amount stated in the multiple indebtedness mortgage.

Under the practice that existed prior to the change to Article 3298 it was not necessary to record or file the note or other evidence of loans made after the recordation of the collateral mortgage. Nor was it necessary to supplement or amend the collateral mortgage if the subsequent advances did not make the loan exceed the total amount of the collateral mortgage. As noted in the Revision Comments-1991:

> (a) As the Expose des Motifs more fully explains, this Article and certain supplemental legislation adopted with it (R.S. 9:5555-5557), is intended to provide a direct and convenient substitute for the so-called collateral mortgage, which in recent years has become widely used, and to permit a person to mortgage his property to secure a line of credit, or even to secure obligations that may not then be contemplated by him except in the broadest sense of an expectation that he may some day incur an obligation to the mortgagee. The supplemental legislation also facilitates the granting of mortgages to secure obligations that are not evidenced by a note paraphed for identification with it. See R.S. 9:5555-5557 (1991).
> (b) The expression in Paragraph A that "a mortgage may secure" is intended to emphasize that a mortgage securing future obligations is not a distinct or different form of mortgage. A mortgage may secure existing obligations; obligations contemporaneously incurred with the execution of the mortgage or specific identifiable or particular and limited future obligations; or general and indefinite future obligations; or any combination of them. The matter is one of contract, not law, and the provisions of this Title regulating mortgages are equally applicable in each case.

If the prior practice did not require an additional recordation when a future advance was made and if the amendment to Article 3298 and the statutory provisions for a MIM were to make the securitization of future loans easier and more adaptable to modern day financing, it is difficult to understand Hari Aum's arguments that another note or an amendment to the MIM was necessary for the Deluxe Motel in Slidell to serve as security for the FGB loan to MHS. As Willenzik has noted, "the major advantage of the multiple indebtedness mortgage. . . is that [it] is much easier and simpler to use. To create a multiple indebtedness mortgage, the borrower must execute only

one document, the multiple indebtedness mortgage agreement itself."[22]

Hari Aum makes much of the fact that the future advances involved here were to MHS and not to Hari Aum. That argument if accepted would limit the use of a MIM to secure only future advances to the mortgagor. That was not the law pre-1992 and certainly is not the law now. The court's holding that the debtor mortgaged the Deluxe Motel to secure the debts of MHS and that the ranking of that mortgage dates from February 1, 2005 can be theoretically based on either one of the two following grounds.

> **1. Even if Hari Aum is not personally liable to FGB for MHS's debts, Hari Aum has mortgaged its property and pledged that mortgage to secure the debts of MHS to FGB.**

Before the 1992 addition of Article 3298 to the Louisiana Civil Code, the parties to the present situation would have accomplished the same security sought here by the use of a collateral mortgage note paraphed for identification with an act of collateral mortgage and a pledge of the collateral mortgage note, either by a third party pledge agreement or language to that effect in the evidence of the underlying indebtedness, commonly referred to as the hand note. The MIM was created to render unnecessary the collateral mortgage/pledge arrangement which was considered unwieldy, undesirable and seldom fully understood by out of state lenders.[23] Many, if not all, of the debtor's arguments are inapplicable if the MIM is compared to, and recognized to be an improvement of, the collateral mortgage/pledge arrangement previously used by banks and other lenders in Louisiana.

> **a. Necessity for an authentic act to evidence Hari Aum's obligation to**

---

[22] *Id* at 51.

[23] *Id* at 48-52.

**pay or give security for the debts of MHS.**

The debtor insists throughout its various briefs that there must be a separate instrument containing a specific promise of Hari Aum to pay the debts of MHS. There was no such requirement in the law prior to 1992 and certainly none contained thereafter in the provisions for a MIM. Although the MIM used in this case by FGB[24] does not specifically mention debts of MHS, it did contemplate that Hari Aum could and would be bound for the debts of other parties to FGB. That forecast became reality when MHS and FGB entered into the transaction, all through Bhula, in 2009. The Acknowledgment is an instrument in writing and formed a part of all the documents executed by Bhula for himself, Hari Aum and MHS, binding all three for any debts then owed or arising thereafter. There is no requirement that this be by authentic act.

### b.  Necessity for recordation of the Acknowledgment

There is no requirement in the Civil Code articles or the Revised Statutes that an instrument such as the Acknowledgment be recorded. If this instrument is analogized to an indorsement on a note or a separate writing binding Hari Aum in solido for debts of MHS, no recordation of these was required under Louisiana law. Thus, it is clear that the debtor's argument in this case seeks to impose an additional requirement for recordation for the use of a MIM. Under either past or present law in Louisiana, a note with or without an endorser need not be recorded. A separate surety or guaranty agreement need not be recorded. An acknowledgment need not be recorded. Hari Aum cites no applicable authority requiring a recordation in this case of anything other than the MIM.

---

[24] The form of the MIM here involved is very similar to that recommended by Willenzik's article in the appendix at p. 63.

### c. Necessity for amendments to the MIM

The debtor also argues that the MIM itself requires any amendments to be in writing.[25] This begs the question whether there is any need for an amendment to the MIM. The provision of the MIM the debtor is referring to requires the *Mortgagee* (FGB) to authorize any amendments, not the debtor/mortgagor; additionally, the very nature and terms of the MIM already envision incurring additional debt, thus adding another loan to be secured by the mortgage does not necessitate an amendment to the terms of the MIM.

### d. Suretyship

The debtor also makes the argument that FGB is asserting that the debtor bound itself as a surety to FGB for the MHS loan. Even though FGB is arguing that the debtor encumbered its property by a mortgage to FGB for the debt of MHS pursuant to Civil Code Article 3295,[26] that is not the same as arguing that there was a contract of suretyship under Civil Code Article 3035. FGB need not rely on concepts of suretyship. As discussed more fully, *supra* pages 9-10, the debtor's mortgage of its Deluxe Motel in Slidell can be sustained on any one of two theories that do not require application of suretyship principles.

### 2. Hari Aum was personally liable to FGB for the debts of MHS.

As previously noted, in 2006 Bhula obtained a commitment from FGB to finance the purchase of the Mississippi property even before MHS was formed, and that acquisition was to

---

[25] P-77 at p. 13, fn. 8.

[26] L.S.A. C.C. Art. 3295 states: "A person may establish a mortgage over his property to secure the obligations of another."

11

be secured by the Deluxe Motel in Louisiana and the hotel to be acquired in Mississippi. In 2009 MHS renewed the 2006 loan from FGB. The note executed in 2009 by Bhula on behalf of MHS was secured by several different pieces of collateral, one of which was the MIM affecting the Deluxe Motel. The 2005 MIM creating this mortgage defined the indebtedness it secured as any and all present and future debts of Hari Aum, "as well as any and all other obligations . . . whether mortgager is obligated alone or with others on a 'solidary' or 'joint and several' basis as a principal obligor or as a surety, guarantor, or endorser, of every nature and kind whatsoever . . . up to $50 million." Thus, it was clearly contemplated that Hari Aum could or would be bound personally with some other entity to pay any future debts owed to FGB.[27]

---

[27] The MIM defines Indebtedness as follows:

> The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably any and all present and future loans, advances, and/or other extensions of credit obtained and/or to be obtained by Mortgagor from Mortgagee, as well as Mortgagee's successors and assigns, from time to time, one or more times, now and in the future, under any and all promissory notes evidencing such present and/or future loans, advances, and/or other extensions of credit, including without limitation, a Note dated January 27, 2005, in the principal amount of $1,800,000.00 from Mortgagor to Mortgagee, and any and all amendments thereto and/or substitutions therefor, and any and all renewals, extensions and refinancings thereof, as well as any and all other obligations, including, without limitation, Mortgagor's covenants and agreements in any present or future loan or credit agreement or any other agreement, document, or instrument executed by Mortgagor and liabilities that Mortgagor may now and/or in the future owe to and/or incur in favor of Mortgagee, whether direct or indirect, or by way of assignment or purchase or a participation interest, and whether related or unrelated, or whether committed or purely discretionary, and whether absolute or contingent, liquidated or unliquidated, voluntary or involuntary, determined or undetermined, due or to become due, and whether now existing or hereafter arising, or otherwise secured or unsecured, whether Mortgagor is obligated alone or with others on a "solidary" or "joint and several" basis, as a principal obligor or as a surety, guarantor, or endorser, of every nature and kind whatsoever, whether or not any such indebtedness may be barred under any statute of limitations or

The provision envisioning that the parties were contemplating future debts of entities other than just Hari Aum was fulfilled in 2009 when MHS refinanced its loan with FGB that had been initially acquired for the purchase of the Mississippi property. The Acknowledgment executed in 2009 by Bhula on behalf of Hari Aum names MHS as the Borrower and Hari Aum as the Grantor, identifies and describes the MIM of 2005 and then provides that the MIM was intended to secure any and all of MHS's (and Hari Aum's) debts, present or future, to FGB.[28] The Acknowledgment goes on to provide, in a paragraph entitled Waivers, that Hari Aum shall remain bound with MHS on a joint and several or solidary basis.[29] This waiver language is sufficient, in this court's opinion, to bind Hari Aum on a personal basis (in solido) for the debts of MHS and effect a cross-collateralization whereby the Deluxe Motel is mortgaged to secure the MHS debt to FGB.

---

prescriptive period or may be or become otherwise unenforceable or voidable for any reason whatsoever. Notwithstanding any other provision of this Mortgage, the maximum amount of indebtedness secured hereby shall be limited to $50,000,000.00.

[28] Acknowledgment, Exhibit E, states:
Grantor reaffirms that Grantor's Mortgage was intended to and shall secure any and all of Borrower's and Grantor's present and future Indebtedness in favor of Lender, as may be outstanding from time to time, one or more times, including Borrower's loan and promissory note described therein, with the continuing preferences and priorities provided under Louisiana law.

[29] Grantor hereby waives presentment for payment, protest and notice of protest and of nonpayment, and all pleas of division and discussion with regard to the Indebtedness. Grantor agrees that Grantor shall remain liable together with Borrower and any and all guarantors, endorsers and sureties of the Indebtedness on a "joint and several" or "solidary" basis. Grantor further agrees that discharge or release of any party, or extension of time for payment, or any delay in enforcing any rights granted to Lender, will not cause Lender to lose any of its rights under this Acknowledgment or under the Indebtedness. Grantor is also waiving any defenses that may arise because of any action or inaction on Lender's part, including without limitation, any failure or delay of Lender to exercise or enforce any of its rights related to Grantor's Mortgage. Exhibit E.

**B.   The authority of Bhula to mortgage the debtor's property to secure the debt of MHS.**

The Louisiana Revised Statutes concerning Limited Liability Companies allows a managing member of a limited liability company to act as a mandatary for the LLC for, "all matters in the ordinary course of its business other than the alienation, lease, or encumbrance of its immovables."[30] Pursuant to L.S.A. Revised Statute 12:1318(B):

> Unless otherwise provided in the articles of organization or a written operating agreement, a majority vote of the members shall be required to approve the following matters, whether or not management is vested in one or more managers pursuant to R.S. 12:1312:
> . . . .
> (2) The sale, exchange, lease, mortgage, pledge, or other transfer of all or substantially all of the assets of the limited liability company.

Here again, the case law interpreting this statute is sparse, which is surprising considering the ever increasing use of LLC's. The debtor argues that because there is no written resolution allowing Bhula to encumber the assets of the debtor, his signature on the Acknowledgment of Multiple Indebtedness Mortgage ("Acknowledgment") is not sufficient to bind the debtor and to allow the use of the mortgage on the Deluxe Motel to secure the loan to MHS.[31] This argument ignores Exhibit K which is entitled Limited Liability Company Resolution to grant Collateral. This instrument certifies that Bhula is a member of Hari Aum and that at a meeting of the

---

[30] L.S.A. R.S. 12:1317(A).

[31] The debtor filed an affidavit signed by Bhula as an exhibit to its reply brief labeled as a supplemental memorandum of law (P-77), wherein Bhula attested to several facts and legal conclusions about the documents that he signed. The court notes that Bhula does not specifically attest that he did not vote to take action to encumber the debtor's property, or that he didn't know he was encumbering the debtor's property by his actions, but only that the documents he signed are not sufficient to legally accomplish this result. The affidavit is supposed to contain facts, not conclusions or arguments such as the legal effect of Bhula's signature on the documents he signed.

members[32] on April 21, 2009 he was authorized to "enter into any agreements of any nature with the Lender [FGB]." Without limiting this broad power given to Bhula the resolution contains the following specific authorizations for Bhula:

> To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all of the Company's real (immovable) property and all of the Company's personal (movable) property and rights, as security for the obligations of HARI AUM, LLC or the Company or for the payment of any loans, any promissory notes, or any other or further indebtedness of HARI AUM, LLC to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated, encumbered, or otherwise secured at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated, encumbered, or otherwise secured. The provisions of this Resolution authorizing or relating to the pledge, mortgage, transfer, endorsement, hypothecation, granting of a security interest in, or in any way encumbering, the assets of the Company shall include, without limitation, doing so in order to lend collateral security for the indebtedness, now or hereafter existing, and of any nature whatsoever, of HARI AUM, LLC to Lender. The Company has considered the value to itself of lending collateral in support of such indebtedness, and the Company represents to Lender that the Company is benefitted by doing so.[33]

L.S.A. R.S. 12:1317(A) is silent as to whether a written resolution is required to evidence a majority vote. The court finds that considering all the circumstances in this case, an additional written resolution is not required. A majority vote can be as simple as the majority of the LLC's members agreeing to an action. Here, there is only one member of the LLC, Bhula, so it can be inferred from the fact that he signed the documents that he voted to take the action to encumber

---

[32] It is indeed a mystery who attended this meeting as it is clear from other documents and is uncontested that Bhula is the sole member of Hari Aum.

[33] Exhibit K to P-34.

the debtor LLC's property.[34] In any event, the resolution language quoted above is sufficiently broad enough authority for the mortgage of the debtor's property to secure any debts to FGB. Happily for the bank, even if the Resolution were not sufficient to authorize the mortgage of the debtor' property, a majority vote of its members is all that is required for a Louisiana LLC to mortgage its property, and, as stated above, the court finds that Bhula voted to do just that by signing the bank's promissory note and Acknowledgment.

### C. The Deluxe Motel secures the MHS loan

The bank's main contention is that the MIM signed by the debtor, along with the promissory note signed by MHS and the Acknowledgment signed by the debtor are enough to create a valid mortgage on the Deluxe Motel to be used later to secure the loan from FGB to MHS. The court agrees. The MIM clearly states that it secures all indebtedness of the debtor, whether the debtor is, "obligated alone or with others on a 'solidary' or 'joint and several' basis, as a principal obligor or as a surety, guarantor, or endorser, of every nature and kind whatsoever." The MIM was properly recorded on February 1, 2005, serving as notice to any other potential creditors that the debtor's property was encumbered up to the amount of $50 million for any present or future loans from FGB. Additionally, the promissory note dated April 21, 2009 clearly lists the MIM as one of the pieces of collateral for the MHS loan.[35] Finally, the Acknowledgment lists Hari Aum as the Grantor and MHS as the Borrower, and it grants a mortgage to FGB on the Deluxe Motel to secure the note executed by MHS.

Bhula's affidavit, page 3 states:

---

[34] This inference would not necessarily follow if this were not a one member LLC.

[35] Exhibit C to P-34.

> Further, at no time during the April 21, 2009 closing did any members of FGB attempt to explain that the Acknowledgment purported to or was intended to create a cross collateralization on the motel property of HA to secure the 2009 Promissory Note executed by MH, in the amount of $4,375,290.81.

It is indeed strange that Bhula expected in 2009 an explanation that Hari Aum's property, the Deluxe Motel in Slidell, Louisiana, was intended to secure the loan by FGB to MHS. He knew from the very outset that this was true. The commitment letter issued to him before MHS was ever created provided that the collateral for the purchase of the Mississippi property was the Deluxe Motel owned by Hari Aum.

The MIM, the note, and the Acknowledgment taken together, along with the facts now before the court, are more than sufficient to find that the MIM secures the MHS loan.

### D. The SBA brief

The Small Business Administration ("SBA") filed a motion to intervene that was unopposed and granted by the court.[36] Although the SBA did not make a motion of its own, it filed a memorandum joining in the debtor's motion for summary judgment. The SBA holds a second mortgage on the Deluxe Motel in the amount of $735,000 secured by a multiple indebtedness mortgage dated June 13, 2006 and recorded on July 10, 2006.[37] First, the SBA argues much along the lines of Hari Aum that there must be a separate instrument in which Hari Aum promises to pay a specific debt of MHS. That is simply not correct as is shown more fully, *supra*, at page 17 of this opinion. The SBA puts a slight refinement on the contention by pointing out that a mortgage is an accessorial obligation and there must be a debt underlying the

---

[36] See Motion P-38 and Order P-68.

[37] P-38.

mortgage. That is correct; such a debt exists in this case. Somehow, the SBA has confused the requirement that there be an underlying indebtedness to support an accessorial document, the MIM in this case, with the idea that it must be a debt of the mortgagor to the mortgagee. As previously explained, the court finds that Hari Aum did have an obligation in solido with MHS that was secured by the MIM. But as also pointed out, there need not necessarily be a promise of Hari Aum to pay the debt of MHS because Hari Aum could, under Article 3295, establish a mortgage on its property to secure the debts of another, in this case MHS.

The SBA also contends that because FGB did not get the SBA's approval to enter into the 2009 loan secured by the Deluxe Motel or record the April 21, 2009 promissory note or Acknowledgment, it ranks ahead of FGB in priority. As stated above at page 7 of this opinion, FGB's multiple indebtedness mortgage gives it priority over all subsequent intervening creditors. The MIM filed in the St. Tammany Parish mortgage records was sufficient to put the SBA on notice that FGB had a first ranking mortgage, potentially up to the amount of $50 million, not only for the $1.8 million loan already outstanding, but also for any future loans it chose to make to the debtor or third parties. It was not FGB's responsibility to contact junior creditors before making additional loans under its MIM. It is the junior creditor's responsibility to protect itself.

**IV.     Conclusion**

For the reasons set forth above, the court grants FGB's motion for summary judgment and denies the debtor's motion for summary judgment. The court finds that the Deluxe Motel

18

property secures both FGB's loan to the debtor and FGB's loan to MHS. The court further finds that the SBA's loan is junior in priority to the FGB loans.

New Orleans, Louisiana, July 11, 2011.

*J. A. Brown*

Jerry A. Brown
U.S. Bankruptcy Judge